**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3524-23

KRISTEN DONDERO,

     Plaintiff-Appellant,

and

ANDREW DONDERO,
her husband,

     Plaintiff-Respondent,

v.

YAAKOV ABDELHAK, M.D.,
MATERNAL RESOURCES OBSTETRICS,
PC, d/b/a MATERNAL RESOURCES,
INTEGRATIVE OBSTETRICS, LLC,
HMH HOSPITALS CORPORATION,
d/b/a HACKENSACK UNIVERSITY
MEDICAL CENTER, HACKENSACK
MERIDIAN HEALTH, INC.,
HACKENSACK UNIVERSITY
MEDICAL GROUP, PC, a/k/a
HACKENSACK MERIDIAN
HEALTH MEDICAL GROUP, a/k/a
HMH  MEDICAL GROUP MEDICAL
and EMILY HOWELL, D.O.,

     Defendants-Respondents.

_____

ERIN A. BEDELL,

     Intervenor-Respondent.

_____

     Argued March 6, 2025 – Decided March 13, 2025

     Before Judges Mawla, Natali, and Walcott-Henderson.

     On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-3527-20.

     Jonathan H. Lomurro argued the cause for appellant Kristen Dondero (Lomurro Munson, LLC, attorneys; Jonathan H. Lomurro and Christina Vassiliou Harvey, of counsel and on the briefs; Andrew Broome, on the briefs).

     Christian C. LoPiano argued the cause for respondent Andrew Dondero (LoPiano Law Firm, attorneys; Christian C. LoPiano, of counsel and on the brief).

     Justyn M. Coddington argued the cause for respondents Yaakov Abdelhak, M.D., Maternal Resources Obstetrics, PC, d/b/a Maternal Resources, and Integrative Obstetrics, LLC (Hall Booth Smith, PC, attorneys; Michael McBride, of counsel and on the brief; Justyn M. Coddington, on the brief).

     Brian G. Stellar argued the cause for respondents HMH Hospitals Corporation, d/b/a Hackensack University Medical Center and Hackensack Meridian Health, Inc. (Connell Foley, LLP, attorneys; Brian G. Steller, of counsel and on the brief; Thomas D. Forrester, Jr., on the brief).

2

Walter F. Kawalec, III, argued the cause for respondents Emily Howell, D.O., and Hackensack University Medical Group, PC, a/k/a Hackensack Meridian Health Medical Group, a/k/a HMH Medical Group (Marshall Dennehey, attorneys; Robert T. Evers and Walter F. Kawalec, III, on the brief).

Gregory J. Giordano argued the cause for respondent Erin A. Bedell (Lenox, Socey, Formidoni, Giordano, Lang, Carrigg & Casey, LLC, attorneys; Gregory J. Giordano, of counsel; Stephanie J. Viola, on the brief).

PER CURIAM

We granted plaintiffs Kristen Dondero and Andrew "Drew" Dondero leave to appeal from a June 5, 2024 order quashing subpoenas they served, and denying their application to file a second amended complaint. We affirm in part, and reverse in part, for the reasons expressed in this opinion.

Plaintiffs filed a medical malpractice complaint after their baby died at thirty-one weeks gestation. They sued the treating physician, defendant Yaakov Abdelhak, M.D., and his employers Maternal Resources Obstetrics, P.C. (MRO) and Integrative Obstetrics, LLC (IO); Hackensack University Medical Center (HUMC) and its affiliates; and Emily Howell, D.O., Jilyan Decker, M.D., and Michelle Kozlovsky, R.N., who were employed or affiliated with HUMC, Hackensack Meridian Health, Inc., Hackensack University Medical Group, P.C.

3

(HUMG), Rutgers Biomedical and Health Sciences, and Rutgers New Jersey Medical School.[1]

In February 2018, Kristen[2] was diagnosed with an ovarian cyst. Two weeks later she learned she was pregnant. On April 6, 2018, she experienced vaginal bleeding and went to HUMC. She was diagnosed with partial placenta previa. Subsequent ultrasounds revealed Kristen's pregnancy was progressing within normal limits, but the cyst had grown.

On August 9, 2018, Kristen met with Dr. Abdelhak, who diagnosed her as a high-risk pregnancy and directed her to HUMC to have the cyst drained. The procedure occurred the following day and Kristen was discharged the same day.

On September 6, 2018, Kristen went to HUMC with early labor symptoms and decreased fetal movement. She was placed on a fetal monitor and observed by Drs. Howell and Decker. Kristen alleged Dr. Abdelhak came to the hospital

---

[1] HMH Hospitals Corporation did business as HUMC and Hackensack Meridian Health, Inc. We refer to them collectively as "the Hospital defendants." The complaint also named HUMG, which later changed its name to Hackensack Meridian Health Medical Group-Specialty Care, P.C., and its affiliates, Meridian Health Medical Group and HMH Medical Group, whom we refer to collectively as "the Group defendants."

[2] Because the parties share the same surname, we refer to them by first name where necessary. We intend no disrespect.

and conducted a vaginal examination.  HUMC discharged her with preterm labor precautions and directed her to follow-up with Dr. Abdelhak.

On September 8, 2018, Kristen returned to HUMC with abdominal pain and decreased fetal movement.  The fetal heart monitor showed no cardiac activity, and an ultrasound confirmed loss of the baby.  After inducing labor, Dr. Abdelhak attempted a vaginal delivery of the baby, but had to internally re-position the baby to effectuate the delivery.

After the delivery, Kristen remained in the operating room because she suffered postpartum hemorrhaging.  Following attempts to stop the bleeding, surgeons performed a hysterectomy.  Kristen received blood transfusions and underwent additional surgeries while in an induced coma because the bleeding continued.  She remained hospitalized for several days, suffering from fevers, abdominal pain, vaginal bleeding, blood clots, and hemorrhagic shock.  Kristen was discharged on September 24, 2018.

Kristen was re-hospitalized twice:  first on October 13, 2018, due to abdominal pain, vaginal bleeding, nausea, and vomiting; and again on April 26, 2019, for an umbilical hernia and gallbladder issues.  Her attempts to preserve her remaining eggs to have a child via surrogacy were unsuccessful.

A-3524-23

Plaintiffs' initial complaint was filed on June 17, 2020, and contained six counts. Counts one through four alleged defendants were negligent in their care of Kristen and their failure to properly inform her about her care as required by the law, resulting in the death of their child and injuries to Kristen. Plaintiffs claimed Dr. Abdelhak committed battery on Kristen and defendants' negligence resulted in additional medical procedures, pain, and suffering. Kristen preserved her claims against future defendants in count four of the complaint. In count five, Drew alleged defendants' negligence caused him mental and emotional distress. Drew alleged a loss of consortium in count six.

Dr. Abdelhak and MRO filed answers, separate defenses, and cross-claims for contribution against the other named defendants. The Hospital and Group defendants, Dr. Howell, and Kozlovsky, filed their answer, separate defenses, and cross-claims for contribution against the other named defendants.

In November 2020, during the initial round of discovery, Dr. Abdelhak and MRO answered form interrogatories. Dr. Abdelhak certified he "would have discussed vaginal delivery [versus] a caesarian section during the course of his treatment" of Kristen. He also certified there were no "known" reviews, investigations, hearings, or reports regarding Kristen's treatment.

6

In January 2021, plaintiffs served a request for supplemental interrogatories on HUMC, requesting it identify or define what documents, information, or communication it considered a part of the medical records; detail any reviews, investigations, or reports prepared in connection with Kristen; identify all personnel who provided care to her; and identify all types of software used to store her records. Plaintiffs also served a notice to produce on HUMC, requesting audit logs, swipe logs, communication records, heart monitor recordings, applicable hospital department plans and policies from 2018, electronic copies of Kristen's entire medical record, and electronic copies of all billing and financial records.

In late January 2021, Dr. Abdelhak and MRO responded to the notice to produce, stating all the information sought was included in Kristen's chart, which had already been provided. In April 2021, plaintiffs moved to strike the pleadings of the Hospital and Group defendants, and Dr. Howell for not answering discovery.

In May 2021, plaintiffs served a notice to produce on all defendants, requesting production of: any oral or written notes, recordings, or correspondence regarding Kristen's treatment; any documents or reports relating to incident reports, investigations, internal reviews, Patient Safety Act reviews,

7

and morbidity and mortality (M&M) conferences;[3] copies of all recorded communications; and any privilege log detailing why specific documents were withheld.

Dr. Howell answered the form interrogatories on May 20, 2021. She certified she examined Kristen at HUMC on September 6, 2018, her "fetal [status] was reassuring," and that Dr. Abdelhak also examined her on that date. Upon discharge, Kristen was provided "pre-term labor precautions," including to monitor fetal counts and return to the hospital if she experienced certain symptoms. On September 8, 2018, Dr. Howell was asked to assist Dr. Abdelhak "in the operating room after the patient was found to be in arm presentation[4]." She said Dr. Abdelhak "effectuated the manual delivery after which, the patient was noted to have hemorrhage," and she referenced her progress notes from

---

[3] An M&M conference is a regular meeting in which healthcare professionals discuss complex or critical patient cases, particularly those involving complications, unexpected outcomes, or potential medical errors, to learn from these experiences, improve patient care and quality by identifying system-level issues, and prevent future occurrences. See Morbidity and mortality conference, Wikipedia, https://en.wikipedia.org/wiki/Morbidity_and_mortality_conference (last visited Mar. 4, 2025).

[4] Arm presentation is where a baby's limb is the first part to emerge during childbirth. Neeta Timilsina et al., Fetus Papyraceous Disguised as Compound Presentation: A Case Report, 81 Annals of Med. & Surgery, Aug. 27, 2022, at 1.

A-3524-23

September 9, 2018. Dr. Howell responded "none to my knowledge" as to whether there were any reviews, investigations, meetings, or reports pertaining to Kristen's care.

On June 8, 2021, the trial court dismissed Kozlovsky from the case because she was not involved in Kristen's treatment. On June 17, 2021, the trial court denied without prejudice plaintiffs' motion to strike the Hospital and Group defendants' answers. The court ordered answers to the outstanding discovery within thirty days, and cautioned there would be sanctions if plaintiffs had to file another motion to obtain this discovery.

On July 20, 2021, HUMG answered plaintiffs' form interrogatories, without providing substantive answers. This response was certified by Larry Reznik, HUMG's Director of Practice Operations.

The same day the Hospital defendants answered plaintiffs' interrogatories by generally referring to exchanged discovery, including Kristen's medical records, as containing all relevant information. This response was certified by Sharon Rakas, a paralegal for Hackensack Meridian Health, Inc.

HUMC also answered plaintiffs' supplemental interrogatories, and certified "there was no review performed" relating to Kristen's treatment. It declined to disclose what medical records software it used at the time because

9

the request was overly broad and irrelevant. Rakas certified this response as well.

On August 6, 2021, the trial court ordered Dr. Abdelhak to provide more specific responses to plaintiffs' interrogatories. On October 22, 2021, the court entered an order compelling the Hospital and Group defendants and Dr. Howell to answer plaintiffs' notices to produce.

On November 5, 2021, HUMC answered plaintiffs' January 11 and May 11, 2021, notices to produce. HUMC also referred to the medical records already submitted and stated it had already provided fetal monitoring strips. It regarded any reviews or internal investigations as privileged and not subject to disclosure. Although it considered the request for all communications vague and overbroad, this information had already been submitted with the medical records. HUMC objected to providing audit logs, swipe logs, hospital bylaws, or the policies and procedures of certain departments, but represented it was in the process of locating the applicable 2018 hospital policies and procedures.

On December 2, 2021, Kristen's attorney corresponded with counsel for the Hospital and Group defendants and Dr. Howell, identifying what he perceived as deficiencies in their discovery responses. On December 3, 2021, the trial court issued an order compelling Dr. Abdelhak's deposition.

On January 10, 2022, plaintiffs deposed Dr. Abdelhak. He testified he had a post-operative visit with Kristen on October 6, 2018, but did not recall the details. Dr. Abdelhak said there were weekly "grand rounds" meetings,[5] comprised of department heads, attending physicians, residents, and students. His attorney objected to disclosure of what was discussed during those meetings.

In March 2022, the parties stipulated to the dismissal of Dr. Decker and Rutgers New Jersey Medical School and Rutgers Biomedical and Health Sciences from the case. On March 23, 2022, the trial court directed the Hospital and Group defendants and Dr. Howell to provide more specific answers and responses to plaintiffs' interrogatories and notices to produce dated January 11 and May 11, 2021. HUMG provided more specific answers to plaintiffs' interrogatories, including a list of providers and witnesses who treated Kristen at HUMC. Reznik certified these responses.

On May 6, 2022, Dr. Abdelhak served a notice to produce on the Hospital and Group defendants relating to the fetal autopsy. HUMC responded to this request five days later by providing a pathology report but otherwise stated the

---

[5] Like M&Ms, grand rounds meetings "are a methodology of medical education and inpatient care, consisting of presenting the medical problems and treatment of a particular patient to an audience consisting of doctors, pharmacists, residents, and medical students." Grand rounds, Wikipedia, https://en.wikipedia.org/wiki/Grand_rounds (last visited Mar. 4, 2025).

A-3524-23

request should be directed to Rutgers New Jersey Medical School, where the autopsy occurred.

On May 13, 2022, the trial court struck the Hospital and Group defendants and Dr. Howell's answers without prejudice for not complying with discovery. The court's order advised their pleadings would be stricken with prejudice if they failed to provide the missing discovery within sixty days.

On May 25, 2022, HUMC answered plaintiffs' supplemental interrogatories. These responses included a list of medical providers who treated Kristen during her admissions on September 6 and 8, 2018. HUMC also identified the various software systems used to store electronic data. It claimed the reviews, investigations, and reports were privileged and confidential, and no review was performed in this case. Both responses were certified by Rakas.

On June 5, 2022, the Hospital and Group defendants and Dr. Howell answered plaintiffs' May 11, 2021, notice to produce. In addition to objecting on grounds of overbreadth and privilege, they responded plaintiffs had already received notes regarding Kristen's treatment by way of the HUMC medical records. They were "not in possession of any documentation" responsive to any internal review or investigation of Kristen's care and had no other

communications about her treatment other than the non-privileged information already provided.

On June 8, 2022, the Hospital defendants responded to plaintiffs' supplemental interrogatories and certified there was no internal investigation, review, or hearings regarding Kristen's care. On June 10, 2022, HUMC submitted more specific responses to plaintiffs' January 11, 2021, notice to produce. It provided audit logs for August 9 and September 6, 2018, and noted plaintiffs already had the logs for September 8, 2018. HUMC certified there were no swipe logs available and any communications relating to Kristen's care were already provided. The 2018 bylaws were not available, and its policies and procedures were proprietary information it could not produce absent a protective order.

On June 24, 2022, the trial court granted the Hospital and Group defendants' request for a protective order, prohibiting the use of the hospital's "credentialing files" and its policies and procedures outside the litigation. In turn, on June 28, 2022, the Hospital and Group defendants and Dr. Howell provided plaintiffs with a CD redacted pursuant to the Patient Safety Act containing the outstanding audit trail with privilege log.

On July 6, 2022, plaintiffs served a request for supplemental interrogatories and notice to produce on all defendants. On July 22, 2022, the trial court entered an order: denying the Hospital and Group defendants' motion to reinstate their answer; directing defendants to provide additional information as requested in plaintiffs' interrogatories; and directing counsel to "engage in a good faith effort to resolve" the additional discovery disputes relating to the audit trail and other electronic data.

On September 12, 2022, HUMG answered plaintiffs' interrogatories, certified by Reznik. The responses stated Dr. Howell treated Kristen on September 6, 8, and 9, 2018, and referred to Dr. Howell's December 29, 2021 deposition, and HUMC's medical records. HUMG provided the same list of treatment providers submitted by HUMC in its response to the uniform interrogatories.

On September 19, 2022, HUMC answered plaintiffs' interrogatories, providing limited substantive information. HUMC certified there was a review regarding Kristen's care. Rakas certified the interrogatory answers.

The parties subsequently filed several motions, which are not a part of the appellate record, that a different judge decided on November 3, 2022. That order denied plaintiffs' request to: amend their complaint; add a count for fraudulent

14

concealment; hold the Hospital and Group defendants in contempt; and dismiss their answer. The motion judge also denied the Hospital and Group defendants' motions for a protective order and to reinstate their answer. He directed: defendants to produce certain discovery, including "Best Practice Advisories[,]" "In-Basket" correspondence, and access audits; all parties to retain technical experts to opine about the procedures and timeframe to produce the additional discovery requests; defendants to comply with plaintiffs' additional discovery requests; and the parties to produce Rakas and Reznik for deposition.

On November 16, 2022, Erin A. Bedell, Esq. withdrew as counsel for the Group defendants and Dr. Howell. Marshall Dennehey, P.C. assumed representation of those defendants. Bedell continued to represent the Hospital defendants.

On November 15, 2022, plaintiffs deposed Rakas. She testified her answers to the interrogatories on behalf of the Hospital defendants were assembled by Maureen Mahoney, Esq., in-house counsel for the hospital. Rakas said her July 20, 2021, responses to interrogatories were based on information from "in-house counsel and defense counsel," and her own review of the medical records. She did not know who manipulated the baby in utero or who delivered the baby.

Rakas testified counsel compiled the list of names of the witnesses involved in Kristen's case and noted they were also listed in her medical records. Those records included hospital records, radiology scans, and portions of an audit log showing who accessed a particular medical record and when. Although pathology scans would typically be included, the hospital did not have them at the time. Plaintiffs requested fetal monitory system audit trails, but Rakas said there were none. Rakas also spoke with Kristen's medical providers about her case, but did not recall who, and said the communications were brief. She testified there were no documents she knowingly withheld.

Rakas obtained the information for her responses from the following sources: the risk management department and its head, Patricia Santaniello, regarding any internal reviews or investigations and internal communications; the information technology (IT) department for electronic medical records and audit trails; the security department for access logs; the IT and labor and delivery department for the heart monitoring information for Kristen and the baby; the medical staff office for hospital bylaws; and labor and delivery personnel for their policies and procedures. Santaniello was the source for her response that there were no investigations or reviews regarding Kristen's case.

A-3524-23

On November 28, 2022, plaintiffs deposed Reznik. He testified he was employed by Hackensack Meridian Health and served as the Vice President of Physician Contracts for Physician Service Division. Reznik did not speak to any HUMG employees and only conferred with Rakas in preparing the interrogatory responses. The responses were pre-populated, and he checked them off and signed them. He had no personal knowledge of the information contained in the responses, engaged in no independent investigation or review of medical records, did not confirm the truthfulness of the responses, and assumed Rakas or her department had "access to all the pertinent documentation needed to answer" the interrogatories.

Plaintiffs moved to amend their complaint, compel discovery, and hold defendants in contempt. On January 12, 2023, counsel for the Hospital and Group defendants sent plaintiffs' lawyer a letter advising they had the following documents in their possession: OB/GYN Department email dated September 20, 2018, with corresponding privilege log; OBGYN Department Internal Review M&M, with corresponding privilege Log; and a OneLink[6] Summary.

---

[6] OneLink is an application, that can "create one single 'smart link[,]' which redirects users to the app or website that is native to their platform. The OneLink process also allows analytics and tracks where each . . . user[] came from and was directed to." OneLink, Business of Apps,

These documents totaled fifty pages and included the coversheet and sign-in sheet for the M&M meeting held on September 21, 2018, at which Dr. Howell served as the preceptor, which was also attended by Dr. Abdelhak.

The Hospital and Group defendants subsequently moved for reconsideration of the November 3, 2022 order compelling discovery. The parties appeared in court on January 13, 2023. Plaintiffs' counsel argued the recent discovery responses contradicted defendant's prior claims that there were no reviews regarding Kristen's treatment. Counsel alleged defendants had withheld discovery for years, their behavior was tantamount to criminal conduct, and questioned to what extent defense counsel participated in suppressing this information.

Bedell, who at the time was still representing the Hospital defendants, denied any intentional wrongdoing. She learned of the new information on December 22, 2022, and disclosed it within a month thereafter. The Hospital defendants were doing their best to locate and provide discovery.

---

https://www.businessofapps.com/marketplace/onelink/ (last visited Mar. 4, 2025).

The motion judge expressed concern about the discovery dispute. He directed the Hospital and Group defendants to comply with the outstanding discovery requests relating to best practice advisories and audit trails.

Plaintiffs requested updated discovery from all defendants, including: how and by whom counsel first became aware of the reviews and what documents they were provided; the names of all attorneys and personnel who participated in investigating and responding to discovery requests; the dates and circumstances of how each party became aware of the "new" information regarding the review; the actual sources of information for each defendants' discovery responses; and information relating to Reznik and Rakas' authority to sign off on the discovery responses. On January 16, 2023, Bedell stated she "became aware of the existence of a potential review on December 7, 2022, and received the documents provided in the amendment on December 22, 2022."

On February 10, 2023, the motion judge entered an order granting plaintiffs leave to file an amended complaint to include a count for fraudulent concealment against Drs. Abdelhak and Howell, and the Hospital defendants. He denied plaintiffs' request to add a fraudulent concealment count against the Group defendants because they had limited involvement in Kristen's treatment and were only involved in billing. The judge denied plaintiffs' requests to hold

defendants in contempt and enter default judgment against them. He directed defendants to comply with discovery.

On February 7, 2023, plaintiffs served 105 "Fraudulent Concealment Interrogatories" on the Hospital and Group defendants seeking: detailed information about who cared for Kristen during her admissions; a timeline of her care and the internal review of her care; details regarding preservation of records relating to Kristen's care; and information about who oversaw specific discovery determinations. The Hospital defendants responded, and regarding the Patient Safety Act review, stated the information was privileged and referred to their March 9, 2023 answers to interrogatories and privilege log. The Hospital defendants also asserted privilege regarding the information sought about Kristen pursuant to the Health Care Quality and Improvement Act. They referred to their January 12, 2023 answers to interrogatories, and the privilege log regarding whether they: took any "professional review action" regarding Kristen's treatment; held an M&M conference regarding her care; or engaged in email correspondence about her treatment in September 2018.

On February 15, 2023, plaintiffs filed their first amended complaint, adding a seventh count alleging the Hospital defendants and Drs. Abdelhak and Howell "negligently and/or intentionally concealed, withheld, altered, or

destroyed evidence relevant to the present litigation and the services provided to [p]laintiffs."  They alleged these defendants did not comply with their discovery responsibilities and failed to:  provide the full audit trails, Best Practice Advisory Alerts, or In-Basket messages; identify or provide emails, M&M conference, OneLink, Patient Safety Act, Self-Critical Analysis, Health Care Quality Improvement, Peer Review and Improvement Act of 1982, and Utilization Review Committee documents; "identify or provide the identity of numerous individuals with knowledge of the subject matter of the present matter"; "identify the sources of information" when responding to discovery requests; and provide the complete audit trails related to Kristen's treatment at HUMC.  Plaintiffs alleged the "withheld information is critical to the litigation . . . to demonstrate knowledge, access, question witnesses, question defendants, and identify involved person(s)."

On February 17, 2023, the judge compelled Mahoney's deposition and denied defendants' cross-motion for a protective order of that deposition.  On March 6, 2023, HUMG responded to plaintiffs' July 6, 2022 notice to produce, which sought information about the contractual relationship between HUMG and various individuals and companies.

On March 20, 2023, plaintiffs deposed Santaniello. She was unaware of any reviews conducted by HUMC regarding Kristen's care. Santaniello testified that when a patient is hurt at HUMC, both the risk management team and the "Quality and Patient Safety Department" would be notified, either via telephone or through a "OneLink" report. She was aware there was a OneLink report regarding Kristen, but as far as she could tell, there was no new information added to the report after the fact.

Santaniello testified if a case was characterized as in "[a]nticipation of litigation," then the risk management team would report it to HUMC's insurance and legal department. A case would be flagged as a compensable event depending on its severity, namely, whether it involved the failure to follow policies and procedures, if the "standard of care was not met," or if "there were variations on the care and process." Citing litigation privilege, Santaniello declined to state whether Kristen's case was identified as in anticipation of litigation case. At another point, she testified although her department had not initially flagged the case, within a few months after Kristen's hospitalization it had anticipated litigation on this case.

Santaniello stated the Quality and Safety Patient Department generally conducted its own review of cases and notified her if there was a deviation in

22

standard of care. She requested a review for Kristen's case, but it was not done. The "Patient Safety Committee" also reviewed cases to determine whether they required reporting under the Patient Safety Act, as required by the Department of Health. Santaniello was part of this reviewing committee and testified it did not review Kristen's case.

A separate committee conducted M&M reviews to determine whether the department had met the standards of care for a particular case. As far as Santaniello knew, the committee maintained no notes or minutes of their meetings. She was not always notified of M&M reviews and did not know if one occurred for Kristen.

Mahoney's deposition took place on March 21, 2023. She testified that if a case involved litigation, HUMG would retain outside counsel for itself and its physicians. When she was reviewing discovery requests in the summer of 2022, a doctor informed her "that he thought there had been some sort of review [on Kristen's case] and that was new information." Mahoney asked Rakas to follow up with the obstetrics department. In the fall 2022, she confirmed there was a quality review and an M&M review regarding Kristen's care. Consequently, the Hospital defendants amended their answers to interrogatories and notified plaintiffs of the newly discovered materials.

Mahoney believed there was a "preliminary Patient Safety committee review" of Kristen's case, but said there was no full review or investigation. She also learned about this review in the fall 2022 and believed this information was contained in the privilege log.

On May 15, 2023, plaintiffs re-deposed Dr. Abdelhak. He testified grand rounds were HUMC's Department of OB/GYN's weekly educational meeting, during which a speaker presented. Oftentimes, the grand rounds included an M&M review, which was a "presentation of a case that had complications." He was present for the grand rounds in 2018, which included an M&M review of Kristen's case. Dr. Abdelhak did not comment during this M&M meeting.

Dr. Abdelhak did not believe the M&M discussions were recorded or documented. He did not recall any conversations about withholding the M&M information from plaintiffs. When he certified in his interrogatories that no reviews had occurred, he "understood the question to mean was there any[thing] out of the norm, anything that was specific for [Kristen's] case." He did not consider the grand rounds presentation related to internal review, but instead an "educational case." Likewise, the emails about the grand rounds were not documentation about the M&M, because they were limited to scheduling. Dr. Abdelhak had "[n]o memory" of other emails about the M&M. He asked his

staff to search for any emails relating to Kristen's treatment, but did not review anything and did not know if there were any found. The doctor was unaware of any other internal reviews, investigations, or meetings regarding Kristen's care.

On April 6, 2023, Connell Foley LLP substituted as counsel for the Hospital defendants, replacing Bedell. That day, Drew's counsel issued a notice for Bedell's deposition.

On April 17, 2023, the motion judge entered an order addressing various discovery motions filed by the parties. He ordered: the deposition of Mark Parrish, the Hospital defendants' Director of Clinical Information; the re-deposition of Dr. Abdelhak; and an explanation from the Hospital defendants detailing the reasoning behind their privilege log.

On April 19, 2023, the parties appeared in court to address motions filed by the Hospital and Group defendants to seal their employees' depositions. Kristen's counsel sought leave to file a motion to amend the complaint to add more specificity to the fraudulent concealment claims and add a count for legal fraud. On April 28, 2023, the motion judge denied the motion to seal the depositions of Mahoney, Santaniello, and Rakas. He granted plaintiffs leave to move to amend the complaint. Pursuant to the April 17, 2023 order, the Hospital

defendants outlined their objections to plaintiffs' notice to produce an audit trail, and submitted the privileged information for an in camera review.

On May 24, 2023, plaintiffs moved to file a second amended complaint, to include a more detailed count seven against the Hospital defendants, Abdelhak, and Howell, and an eighth count for "legal fraud" against the Hospital and Group defendants, MRO, Drs. Abdelhak and Howell, Reznik, and Rakas. The proposed second amended complaint alleged discovery disproved defendants sworn assertions "that there were no reviews, investigations, and hearings held regarding Kristen." Discovery revealed defendants engaged in "[m]ultiple reviews" about what transpired with Kristen and the baby. This included when Kristen was still hospitalized, namely by: the "Quality Dep[artment]" during monitoring of Kristen's medical record during her August and September 2018 admissions, and following her discharge; the risk department in its review of her records during her September 2018 admission; by Drs. Abdelhak and Howell and others at the September 21, 2018 M&M review of Kristen's care; and the Hospital defendants' legal department during a review of Kristen's medical records in September 2018.

Plaintiffs claimed defendants failed to preserve internal communications relating to Kristen's care. They also claimed there were modifications to

Kristen's medical records between 2020 and 2023, after the litigation commenced. Defendants' late disclosures of witnesses who previously had not been identified and the passage of time risked the spoliation of evidence held by these potential witnesses.

On June 13, 2023, Drew served subpoenas for Bedell's deposition and the production of documents. Bedell moved to quash the subpoenas. The Hospital defendants also moved to quash them, or alternatively, for a protective order barring the production of documents and Bedell's deposition.

On July 18, 2023, HUMG answered plaintiffs' request for admissions. Its responses did not include many substantive disclosures.

On September 12, 2023, with consent of the parties, the judge appointed a special discovery adjudicator (SDA) "for the purpose of addressing and making recommendations to the court" about: identified pre-trial discovery disputes, which had yet to be resolved; plaintiffs' application to depose Bedell; and future pre-trial discovery disputes. The SDA was authorized to "make findings of fact and conclusions of law with respect to the matters presented by the parties," and "report the same to the [c]ourt as soon as practicable." The parties were given fourteen days from the SDA's report to object or otherwise the judge would deem the recommendations "adopted in full." The motion judge

would review the SDA's findings of fact and rulings on questions of law de novo. The SDA's rulings on procedural matters would be subject to an abuse of discretion review standard. The initial appearance before the SDA occurred on September 28, 2023, to address a schedule for the exchange and review of certain evidence and scheduling of depositions of all individuals with knowledge of Kristen's care.

On October 27, 2023, the Hospital defendants submitted supplemental responses to plaintiffs' notice to produce, certified by Rakas. They again asserted any documents relating to internal reviews or investigations were privileged, and otherwise referred to previously submitted discovery responses and privilege logs. The digital information sought was likewise privileged but had been disclosed with Kristen's HUMC medical records and the audit trail produced on March 14, 2023.

The discovery response also attached two certifications from Parrish, who certified that "In-Basket Messages are a certain type of record that serve as a communication tool for clinicians and staff and are not a substitute for documentation in a patient's record." He stated these messages were routinely purged every sixty days, and there were "no retrievable In-Basket messages" relating to this matter. Parrish also estimated plaintiffs' request for Best Practice

28

Advisories would take approximately thirteen hours to produce and would "place a significant burden on [the hospital] and directly impact [his] ability to perform vital functions for [the hospital]."

On October 31, 2023, the SDA entered an initial order outlining the agreed upon discovery at the parties' conference with her. On November 14, 2023, the Hospital defendants produced autopsy photographs of the baby, as directed in the SDA's order. The Hospital defendants produced additional responses to form and supplemental interrogatories on December 19, 2023.

On December 18, 2023, the SDA issued an oral decision denying Kristen's motion to amend the complaint to add a legal fraud claim. The SDA characterized plaintiffs' allegations of fraud as encompassing "discovery disputes, including relevance and privilege issues," which was legally insufficient to sustain this cause of action. Allowing fraud claims against Rakas and Reznik merely for their certifications or deposition testimony would enable a litigant to assert fraud every time an individual testified falsely or incompletely. The SDA reasoned the better recourse was to seek sanctions or try to undermine the adverse party's credibility at trial.

The SDA found plaintiffs could not sustain a fraud claim against the Group defendants because the motion judge had previously precluded a

fraudulent concealment claim against them and plaintiffs had not made any new allegations against the Group defendants. The Group defendants had a different, more limited role in Kristen's care and were not in possession of any of the documents in dispute. The SDA denied the fraud claim against the Group defendants for the same reasons the motion judge had denied the fraudulent concealment claim against them.

The SDA concluded the information sought from Bedell was not relevant to the fraudulent concealment claim because the missing evidence had been produced through a less obtrusive means and the attorney-client and work product privileges protected Bedell's communications with her former clients. She quashed the subpoenas issued to Bedell and granted Bedell's and the Hospital defendants' motion for a protective order.

Plaintiffs objected to the SDA's rulings. In January 2024, they moved to file a new, second amended complaint, adding: a more detailed count seven for fraudulent concealment and spoliation of evidence against the Hospital defendants, and Drs. Abdelhak and Howell; a new count eight for fraudulent concealment and spoliation against MRO, IO, Rakas, Reznik, and Mahoney; a ninth count for legal fraud against the Hospital and Group defendants, MRO, IO, Drs. Abdelhak and Howell, Rakas, Reznik, and Mahoney; and a tenth count

for conspiracy against the Hospital and Group defendants, Rakas, Reznik, and Mahoney. In addition to the facts and procedural history previously contained in plaintiffs' proposed second amended complaint, they alleged defendants engaged in subsequent legal misrepresentations involving their discovery violations.

On January 25, 2024, Drew moved to enforce litigant's rights and compel Bedell to appear for deposition and produce the documents he subpoenaed. In the interim, there was a flurry of legal activity before the motion judge, our court, the Supreme Court, and the Bergen Vicinage Presiding Judge of the Civil Part, which we need not detail here. After these matters were addressed, the motion judge adjudicated plaintiffs' motions regarding the proposed second amended complaint and compelling discovery on June 5, 2024.

The judge credited the SDA's findings that none of the parties were recalcitrant and that there was "significant progress" in the production of discovery. He also accepted the SDA's finding there was no indication of the spoliation of evidence.

Regarding the motion to amend, the judge acknowledged the Hospital defendants' "initial lack of responsiveness," which is in part why he permitted plaintiffs to add a fraudulent concealment count to the February 2023 complaint.

31

However, he now viewed "this battle through a different lens," based on the "current facts and circumstances" and found a lack of direct evidence the Hospital defendants continued to be non-responsive to discovery, provided inaccurate information, or conspired to deny them full access to discovery. Instead, the judge attributed the ongoing delays to plaintiffs' litigiousness.

Although plaintiffs noted there was a missing pathology slide, there was no indication it was intentionally destroyed or withheld, or any evidence the slide was critical to Kristen's case. Plaintiffs failed to present "a scintilla of evidence" that any inaccuracy in discovery was "due to some conspiracy about [the Hospital defendants] and . . . Bedell to defraud . . . [p]laintiffs." The judge concluded that allowing a claim for fraud based on inaccuracies in discovery would lead to "legal chaos" and was contrary to the objective of our discovery rules. Even though the judge had initially permitted plaintiffs to amend their complaint to assert fraudulent concealment, the facts presently before him showed "each element may now be called into question in light of compliance, review, guidance, and direction of the [SDA] and production of significant discovery."

Because there was no direct evidence of impropriety, the judge concluded the privilege claims applied and quashed the Bedell subpoenas and entered a protective order. He denied the motion to file the second amended complaint.

I.

On appeal, plaintiffs argue the motion judge abrogated his responsibility to review the facts and the law de novo, and instead deferred to the SDA's findings in denying the motion to amend and quashing the Bedell subpoenas. They claim the judge did not review the motion to amend liberally and instead focused on what evidence plaintiffs had to prove fraudulent concealment, fraud, and conspiracy.

Plaintiffs assert the decision to quash the Bedell subpoenas was based on a misapplication of the facts and law. Bedell's testimony was relevant to the fraudulent concealment claim, and rather than quashing the subpoena altogether, the more appropriate course would have been to allow Bedell's deposition and let defense counsel object based on privilege on a question-by-question basis. Drew points out Bedell's deposition was permissible under the crime-fraud exception. We address these arguments in turn.

## II.

Pursuant to Rule 4:41-3, an order appointing an SDA may "specify or limit the . . . adjudicator's powers" as the trial court directs. However, "[s]ubject to such specifications and limitations, the [SDA] . . . shall exercise the power to regulate all proceedings in every hearing, to pass upon the admissibility of the evidence and to do all acts necessary or proper for the efficient performance of the duties directed by the order." Ibid. This includes requiring "the production of testimonial and documentary evidence upon all matters within the scope of the reference" and examining the parties and any witnesses under oath. Ibid.

Rule 4:41-5(a) states the SDA must submit a report with any findings of fact and conclusions of law as required by the order of appointment. In non-jury actions, the trial court "shall accept the [SDA's] findings of fact unless contrary to the weight of evidence." R. 4:41-5(b). The court "may adopt the report, modify or reject it in whole or in part, receive further evidence, or recommit it with instructions." Ibid. In a jury action, the SDA's findings "are admissible as evidence of the matters found," and may be introduced to the jury, "subject to the ruling of the court upon objections to the report or the evidence." R. 4:41-5(c).

34

On appeal, we review an SDA's findings and conclusions of law under the "ordinary standards of review, considering them in the same manner as we would the findings and conclusions of a judge sitting as a finder of fact." State v. Chun, 194 N.J. 54, 93 (2008). "We 'accept[] the fact findings of a special [adjudicator] to the extent they are supported by "substantial credible evidence in the record."'" Little v. Kia Motors Am., Inc., 242 N.J. 557, 593 (2020) (alteration in original) (quoting State v. Cassidy, 235 N.J. 482, 491 (2018)). However, we "owe no particular deference to the legal conclusions" of the SDA. Chun, 194 N.J. at 93 (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

In performing a de novo review, a reviewing court "owe[s] no deference to the interpretative analysis" of the original reviewing body, "except as [it] may be persuaded by the reasoning of those courts." Morgan v. Sanford Brown Inst., 225 N.J. 289, 303 (2016) (citing Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 445-46 (2014)). Therefore, even in a de novo review, our courts may "agree with and adopt the [s]pecial [adjudicator's] finding." State v. Olenowski, 255 N.J. 529, 587 (2023).

At the outset, we note the motion judge considered plaintiffs' May 2023 motion to amend the complaint as a discovery dispute to be resolved by the SDA.

Notwithstanding the fact the motion to amend the complaint arose from the parties' discovery issues, the order appointing the SDA did not authorize the SDA to decide motions to amend the pleadings. This motion should have been resolved by the motion judge in the first instance.

Regardless, this was harmless error because the SDA addressed the proposed May 2023 second amended complaint. The judge addressed the new, proposed January 2024 version of the second amended complaint, which included different causes of action for fraudulent concealment and legal fraud, and an additional claim of conspiracy. Although the judge spoke approvingly of the SDA's role and her findings related to this motion, his findings demonstrate he engaged in an independent review of the evidence, and the parties' objections and legal arguments. We are satisfied the judge conducted a de novo review.

### III.

"We review a trial court's decision to grant or deny a motion to amend the complaint for abuse of discretion." Grillo v. State, 469 N.J. Super. 267, 275 (App. Div. 2021) (quoting Port Liberte II Condo. Ass'n, Inc. v. New Liberty Residential Urb. Renewal Co., 435 N.J. Super. 51, 62 (App. Div. 2014)). "An abuse of discretion 'arises when a decision is made without a rational

explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

"Rule 4:9-1 requires that motions for leave to amend be granted liberally." Kernan v. One Washington Park Urb. Renewal Assocs., 154 N.J. 437, 456 (1998) (citing Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 4:9-1 (1998)). This is the case "even if the ultimate merits of the amendment are uncertain." G&W, Inc. v. Borough of E. Rutherford, 280 N.J. Super. 507, 516 (App. Div. 1995) (citing City Check Cashing v. Nat'l State Bank, 244 N.J. Super. 304, 308-09 (App. Div. 1990)). A court must treat all the allegations in the pleadings as true. Webb v. Witt, 379 N.J. Super. 18, 28 (App. Div. 2005).

"While motions for leave to amend pleadings are to be liberally granted, they nonetheless are best left to the sound discretion of the trial court in light of the factual situation existing at the time each motion is made." Fisher v. Yates, 270 N.J. Super. 458, 467 (App. Div. 1994) (citing R. 4:9-1). "That exercise of discretion requires a two-step process: whether the non-moving party will be prejudiced, and whether granting the amendment would nonetheless be futile." Notte v. Merchs. Mut. Ins. Co., 185 N.J. 490, 501 (2006). A court may deny the

application if "the newly asserted claim is not sustainable as a matter of law[,]" as "there is no point to permitting the filing of an amended pleading when a subsequent motion to dismiss must be granted." Ibid. (quoting Interchange State Bank v. Rinaldi, 303 N.J. Super. 239, 256 (App. Div. 1997)). It may also consider "the reason for the late filing," whether an amendment would "cause undue delay of the trial," or whether it would "constitute an effort to avoid another applicable rule of law." Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 485 (App. Div. 2012) (citations omitted).

A.

"A misrepresentation amounting to actual legal fraud consists of a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." Suarez v. E. Int'l Coll., 428 N.J. Super. 10, 28 (App. Div. 2012) (quoting Jewish Ctr. of Sussex Cnty. v. Whale, 86 N.J. 619, 624 (1981)). "[C]lear and convincing proof" is required to support amendment of a complaint to add a claim of fraud. Fox v. Mercedes-Benz Credit Corp., 281 N.J. Super. 476, 484 (App. Div. 1995).

There is little authority on whether the withholding of discovery constitutes a cause of action for fraud. In Fox, the plaintiff sought to amend his

complaint to include a cause of action for fraud based on "the intentional aspect of withholding discovery." Ibid. We affirmed the denial of the motion to amend, not because a discovery dispute cannot support a fraud claim, but there was insufficient evidence to support the cause of action. Ibid.

Viviano v. CBS, Inc., 251 N.J. Super. 113, 122-23 (App. Div. 1991), also involved causes of action including for fraudulent misrepresentation, fraudulent concealment, and conspiracy based on the defendants' late production of evidence. However, that case did not address the legal fraud claim and focused only on the viability of the plaintiff's fraudulent concealment claim. Id. at 122.

In Jadlowski v. Owens-Corning Fiberglas Corp., 283 N.J. Super. 199, 217 (App. Div. 1995), we commented briefly on the defendant's misrepresentation of evidence in the punitive damages phase of a toxic tort litigation. We held "[o]ne way to prove plaintiff's claim of fraud was to show that the corporation indeed had contrary information six years before the interrogatory answers were rendered." Ibid. However, our discussion entailed whether the discovery violations supported a greater punitive damages amount; not whether it supported a fraud claim. Ibid.

Here, plaintiffs' fraud allegations were that defendants engaged in a concerted effort to withhold information from them, frustrating their efforts to

pursue the malpractice claim. The missing information included: who had treated Kristen during her two hospital visits; what her scans showed during the first visit; who delivered the baby; who ruptured Kristen's uterus, whether defendants engaged in internal communications regarding her care after the fact; and whether those communications included any information on these points.

Having considered the record, we conclude the motion judge properly denied the motion to amend to include a fraud claim. The judge correctly found the claim was not sustainable as a matter of law. Notte, 185 N.J. at 501. There was no showing defendants knew of the falsity of their representations to plaintiffs when they produced or failed to produce discovery. Therefore, this claim would be futile because it lacked an essential element.

## B.

We reach a different conclusion regarding the fraudulent concealment claim. The motion judge did not review the elements of fraudulent concealment. Instead, he commented that while some of the elements may have been present, they were now all "called into question." He also found plaintiffs were not damaged because the discovery they sought was ultimately produced. We part ways with these findings.

While the elements of fraudulent concealment and legal fraud overlap, fraudulent concealment is a cause of action specifically premised on the withholding of evidence. Rosenblit v. Zimmerman, 166 N.J. 391, 406-07 (2001); Viviano, 251 N.J. Super. at 129-30. To prevail on a fraudulent concealment claim, a plaintiff must demonstrate:

> (1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;
>
> (2) That the evidence was material to the litigation;
>
> (3) That plaintiff could not reasonably have obtained access to the evidence from another source;
>
> (4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation;
>
> (5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.
>
> [Rosenblit, 166 N.J. at 406-07.]

If these elements exist, then a plaintiff may "invoke[]" a fraudulent concealment claim "as a remedy for spoliation." Id. at 407.

In Rosenblit, our Supreme Court addressed fraudulent concealment in the context of spoliation; "the hiding or destroying of litigation evidence, generally by an adverse party." Id. at 400-01 (citing Bart S. Wilhoit, Cmt, Spoliation of

41

Evidence: The Viability of Four Emerging Torts, 46 UCLA L. Rev. 631, 633 (1998)). The Court held that included among other remedies for spoliation, was permitting amendment of the complaint, or filing a separate cause of action, for fraudulent concealment. Id. at 401-03.

As we noted, plaintiffs had already been permitted to amend their complaint to include a fraudulent concealment claim against Drs. Abdelhak and Howell and the Hospital defendants. We discern no prejudice to permitting them to amend to include MRO, IO, Rakas, and Mahoney, all of whom are affiliated with those original defendants.

Plaintiffs pled sufficient facts to support the first three factors for a fraudulent concealment claim. Indeed, there is no dispute defendants had an obligation to answer discovery. There is no credible dispute the information plaintiffs sought was material and defendants were the only source from which to obtain it.

As for the fourth factor, although defendants' intentions regarding why they withheld the information may ultimately be proven to be for innocent or valid business purposes, we must at the pleadings stage view plaintiffs' claims with liberality and take them as true. The strongest support for this factor of the fraudulent concealment claim is defendants' denials that there were any reviews

involving Kristen's care only to have the Hospital defendants' subsequent discovery disclose there was an M&M review. There is no dispute both Drs. Abdelhak and Howell were present at the M&M review, and other employees of both MRO and HUMC were present or notified about the meeting. Dr. Abdelhak claimed he did not consider the M&M an internal review since it was part of a more routine grand rounds meeting; the other defendants have not explained this omission.

Mahoney later stated there was some form of "quality review" and a "preliminary Patient Safety Committee review" regarding Kristen's treatment, although Santaniello denied either of those reviews occurred. To compound this, while Mahoney learned of the M&M review in the Summer of 2022, in subsequent discovery responses—HUMC's September 2022 answers to interrogatories and Rakas's November 2022 deposition—the Hospital defendants continued to deny that any such review had occurred. Aside from the failure to disclose the M&M, plaintiffs' second amended complaint alleged the OneLink records they received listed numerous witnesses who previously had not been disclosed by defendants.

Whether these facts evidence innocence in the form of poor record keeping and faulty memories or intentionality is a factual dispute, which cannot

43

be determined at this juncture. It is enough for us to conclude the allegations are sufficient and that, if proven true, they would support the fourth factor of plaintiffs' claim of fraudulent concealment.

The fifth fraudulent concealment factor was also sufficiently pled because the withholding of the aforementioned information damaged plaintiffs' ability to proceed with their case. We juxtapose two cases to demonstrate the point.

In Viviano, the plaintiff suffered a workplace injury related to defective machinery and filed suit against her employer and the manufacturer of the machinery. 251 N.J. Super. at 118-19. Her suit against her employer was dismissed, and while her personal injury products liability suit against the manufacturer was still pending, she discovered her employer possessed a memorandum identifying the defect that had caused her injury. Id. at 118-19. She then filed a separate suit against her employer and the other defendants for fraudulent concealment. Id. at 118-21. While she ultimately settled the products liability personal injury lawsuit against the machine manufacturer, she maintained her fraudulent concealment suit, arguing her employer's late disclosure of evidence delayed her eventual settlement with the manufacturer. Ibid. She was successful in this suit, and the jury awarded her damages, including for lost interest from the delayed settlement. Id. at 129-30.

In contrast, in Rosenblit, 166 N.J. at 411, the Court determined the plaintiff could not sustain a separate action for fraudulent concealment because while the defendant attempted to alter or withhold her medical records, plaintiff had obtained the unaltered records prior to trial. Therefore, neither an adverse inference nor a fraudulent concealment charge was appropriate; rather, the plaintiff could present "evidence of [the doctor's] misdeeds" to the jury. Ibid.

The central consideration of these rulings was how the withheld evidence impacts a plaintiff's case. Here, that defendants ultimately located and produced some evidence should not bar plaintiffs' ability to claim fraudulent concealment. Plaintiffs' allegation that the years' long delay in disclosure damaged them, including the potential loss of witnesses or fading witness memory, excessive litigation costs, and emotional stress is plausible. Plaintiffs should have been permitted to amend their complaint to include a count for fraudulent concealment.

As we noted, the motion judge initially permitted plaintiffs to assert claims of fraudulent concealment against Drs. Howell and Abdelhak, and the Hospital defendants, but not HUMG given its limited involvement in Kristen's treatment. Reznik certified the interrogatories on behalf of HUMG.

45

The proposed January 2024 second amended complaint did not seek to add the Group defendants to the fraudulent concealment claim. Moreover, plaintiffs' allegations of withheld evidence do not implicate the Group defendants. There is no suggestion the Group defendants knew or should have known of the internal reviews or otherwise withheld evidence. No evidence exists that Reznik, as an agent for the Group defendants, engaged in the acts of fraudulent concealment alleged against the other defendants. It follows that because Reznik's involvement in this litigation was limited to HUMG's responses and HUMG has not been added as a defendant to the fraudulent concealment claim, the fraudulent concealment claim does not apply to Reznik as well because it would be futile.

Conversely, the fraudulent concealment claim applies to MRO and IO, as Dr. Abdelhak's employer. MRO and IO were privy to at least the M&M, because Dr. Abdelhak was present for that meeting, as were other physicians employed by these entities.

The fraudulent concealment claim also applies to Rakas and Mahoney, as the Hospital defendant's agents who responded to the interrogatories. The record shows these defendants knew of the internal reviews and potentially withheld this information from plaintiffs. Rakas and Mahoney were directly

46

involved in discovery exchanges in which the existence of internal reviews and investigations were misrepresented, including after the Hospital defendants learned that such internal reviews had happened.

For these reasons, we reverse the order barring plaintiffs from amending their complaint to assert additional facts regarding their existing count seven against Drs. Abdelhak and Howell, and the Hospital. We also reverse the ruling barring the addition of an eighth count for fraudulent concealment against MRO, IO, Rakas, and Mahoney.

## C.

Our Supreme court has defined civil conspiracy as

> a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage[s].
>
> [Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177 (2005) (quoting Morgan v. Union Cnty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993)).]

The cause of action is premised on an "underlying wrong which, absent the conspiracy, would give a right of action." Id. at 177-78.

47

Plaintiffs alleged defendants, in concert, agreed to withhold evidence relating to Kristen's treatment. The record does not support the claim that either the Group defendants and their employees, or Drs. Abdelhak and Howell and their employers acted in concert vis-à-vis each other, or the Hospital defendants and their employees. For these reasons, the motion judge correctly concluded a conspiracy claim could not be asserted against the Group defendants or their employees, or Drs. Abdelhak and Howell, MRO, and IO.

However, the motion judge should have permitted plaintiffs to amend to include a count for conspiracy against the Hospital defendants, Mahoney, and Rakas. These defendants knew of the internal reviews and potentially withheld this information from plaintiffs. Rakas and Mahoney were directly involved in furnishing discovery related to whether there were internal reviews and investigations. They could have conspired with the Hospital defendants to withhold this information. Viewing plaintiffs' allegations through a liberal lens, this was not a futile claim.

D.

To summarize, plaintiffs shall be permitted to amend their complaint to assert fraudulent concealment claims against the Hospital defendants, Drs. Abdelhak and Howell; MRO and IO; Rakas; and Mahoney. They shall also be

permitted to amend to include conspiracy claims against the Hospital defendants, Rakas, and Mahoney. The fraud claim against all defendants shall remain dismissed.

## IV.

Finally, we address the propriety of the Bedell subpoenas. We conclude they were properly quashed.

Rule 4:10-2(a) states "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." However, to obtain discovery of materials "prepared in anticipation of litigation," the party seeking discovery must show that they have a "substantial need of the materials in the preparation of the case and [are] unable without undue hardship to obtain the substantial equivalent of the materials by other means." R. 4:10-2(c).

"Rule 4:10-3 provides the means by which a person, including a party's attorney who objects to a deposition, can obtain protection against improper intrusion into the adversarial process by an improvidently issued deposition subpoena." Kerr v. Able Sanitary & Env't Servs., Inc., 295 N.J. Super. 147, 155 (App. Div. 1996). The party opposing the subpoena may apply for a protective order. R. 4:10-3.

Although the burden is on the movant to show good cause for the protective order, "in situations involving a request to depose an opposing party's attorney, there are good reasons for shifting the burden to the proponent of the deposition to demonstrate the propriety and need for the deposition." Kerr, 295 N.J. at 155-56. The proponent must thus demonstrate the "propriety and need for the deposition outweigh the possible disruptive or burdensome effects that the prospective deposition will have on the underlying litigation." Id. at 158. In assessing the propriety and need for the deposition, courts should consider:

> (1) the relative quality of the information purportedly in the attorney's knowledge, and the extent to which the proponent of the deposition can demonstrate the attorney possesses such information; (2) the availability of the information from other sources that are less intrusive into the adversarial process, i.e., the extent to which all other reasonable alternatives have been pursued to no avail; (3) the extent to which the deposition may invade work product immunity or attorney-client privilege; and (4) the possible harm to the party's representational rights by its attorney if called upon to give deposition testimony, i.e., the extent to which the deposition will affect attorney preparation or participation on behalf of the client. Consideration of these or any other relevant factors, either singly or in combination, will determine in a particular case whether the party seeking the deposition of opposing counsel has overcome the presumptive "good cause" for the protective order. If such showing is not made, a protective order should issue.
>
> [Id. at 159.]

A trial court's ruling on what is discoverable is entitled to deference. Payton v. N.J. Tpk. Auth., 148 N.J. 524, 559 (1997). We will not reverse unless it "abused its discretion or its determination is based on a mistaken understanding of the applicable law." Platkin v. Smith & Wesson Sales Co., Inc., 474 N.J. Super. 476, 489 (App. Div. 2023) (citing In re Subpoena Duces Tecum on Custodian of Recs., 214 N.J. 147, 163 (2013)).

The motion judge did not abuse his discretion. Plaintiffs did not demonstrate Bedell was in possession of information relevant to their fraudulent concealment claims and there were no other, less intrusive sources from which to obtain this information. Bedell represented she had no knowledge of the internal reviews and investigations until December 2023, and that she promptly disclosed it to counsel in January 2024. There is no suggestion her representation was false.

Plaintiffs had a less intrusive source for the information, namely, Mahoney and Rakas. Plaintiffs deposed Mahoney and Rakas in March 2023, after learning of the internal reviews, and nothing in those depositions pointed to Bedell's involvement in, or her first-hand knowledge of, the alleged fraudulent concealment or conspiracy to warrant intrusion into the attorney-client relationship or overcoming the presumption for a protective order.

N.J.R.E. 504(2)(a) states the attorney-client privilege "shall not extend . . . to a communication in the course of legal service or obtained in aid of the commission of a crime or a fraud." "The party seeking to overcome the privilege and obtain access to the communication must make a prima facie showing of fraud or crime, and the prima facie showing must be made by evidence other than the contested communication itself." Ocean Spray Cranberries, Inc. v. Holt Cargo Sys., Inc., 345 N.J. Super. 515, 523 (Law Div. 2000).

Although we reversed the motion judge's ruling as to the fraudulent concealment regarding the Hospital defendants, there is no evidence Bedell assisted the Hospital or Group defendants in perpetrating this alleged conduct to warrant the invocation of the crime-fraud exception. For these reasons, we reject Drew's argument this was grounds to permit the Bedell subpoenas to proceed.

Affirmed in part and reversed in part. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division